**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ACUREN INSPECTION, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| RYAN DILLON, JESUS VILLALTA JR., | § | |
| BRIAN PERRY, AND AMERICAN | § | |
| PIPING INSPECTION, INC., | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT**

Plaintiff Acuren Inspection, Inc. ("Acuren") files this Original Verified[1] Complaint ("Complaint") against Defendants Ryan Dillon ("Dillon"), Jesus Villalta Jr. ("Villalta"), Brian Perry ("Perry"), and American Piping Inspection, Inc. ("API") (collectively, "Defendants").

**NATURE OF THE ACTION**

1.      While still employed by, and receiving pay from, Acuren, Dillon, Villalta, and Perry (collectively, the "Individual Defendants") secretly conspired with API to unfairly compete with Acuren. Specifically, Defendants unlawfully solicited Acuren's workforce and clients, absconded with Acuren's property and confidential information, and otherwise disparaged and undermined Acuren's business relationships.   Acuren now seeks relief from this Court for Defendants' willful attack on its business and files this civil action for damages and preliminary and permanent injunctive relief for Defendants' respective violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"); breach of restrictive covenants in the Individual Defendants' Confidentiality and Non-Solicitation Agreements ("Agreements") with Acuren;

---

[1] The factual statements in this Original Verified Complaint are verified by the Verification of Wesley Chatagnier, attached hereto as <u>Exhibit 1</u>, the Declaration of William Whittington, attached hereto as <u>Exhibit 2</u>, and the Verification of Michael Saunders, attached hereto as <u>Exhibit 3</u>.

tortious interference with contract; breach of fiduciary duty; tortious interference with existing contracts and prospective business relationships; civil conspiracy; unfair competition; business disparagement; conversion; and commercial bribery in violation of Texas Penal Code § 32.43.

2.      Acuren originally filed its claims against Defendants in the 164th Judicial District Court of Harris County, Texas on May 3, 2024 ("Texas Action"). *See Acuren Inspection, Inc. v. Ryan Dillon, et al.*, Cause No. 2024-28695, in the 164th Judicial District Court of Harris County, Texas. In Plaintiff's Verified Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction in the Texas Action ("Texas Petition"), Acuren alleged that the Court had jurisdiction over Acuren's claims because the Individual Defendants are Texas residents and API is registered to and does conduct business in Texas and, by participating in and benefiting from the Individual Defendants' conduct, committed torts against Acuren in the State of Texas. At the time, Acuren did not have sufficient evidence to assert a claim under the DTSA and, thus, the Texas Petition only asserts claims under Texas law. Acuren's Application for Temporary Restraining Order was set for hearing on May 6, 2024 ("TRO Hearing").

3.      The morning of the TRO Hearing, Defendants filed their collective Verified Special Appearances to Contest Personal Jurisdiction ("Special Appearance"). (*See* Special Appearance, attached hereto as <u>Exhibit 4</u>.) Specifically, Defendants sought dismissal of the Texas Action—as to all claims and all Defendants—based on the forum selection clauses in the Individual Defendants' Agreements with Acuren. (*See* Dillon Agreement, attached hereto as <u>Exhibit 5</u>; Villalta Agreement, attached hereto as <u>Exhibit 6</u>; Perry Agreement, attached hereto as <u>Exhibit 7</u>.) As alleged by Defendants, the forum selection clauses provide for exclusive jurisdiction in Connecticut. Counsel for Defendants appeared at the TRO Hearing subject to the Special Appearance and, in open court, argued that Connecticut was the proper forum for not just the

Individual Defendants, but API as well because the claims against API arise from conduct governed by the Agreements.

4.      On May 7, 2024, after a second TRO Hearing, the ancillary court[2] in the Texas Action entered a Temporary Restraining Order, enjoining Defendants from, among other restrictions, soliciting employees, soliciting services on behalf of API to certain Acuren customers, publishing disparaging statements about Acuren, and/or disclosing or destroying Acuren's confidential information. (*See* Texas Action Temporary Restraining Order, attached hereto as Exhibit 8.) The ancillary court did not take up the issue of personal jurisdiction, and Defendants have not yet requested a separate hearing with respect to their Special Appearance. The assigned court in the Texas Action set a hearing on Acuren's application for temporary injunction for May 16, 2024. (*See* Exhibit 8.)

5.      However—to avoid any potential delay and ensure the enforceability of the injunctive relief requested—Acuren now refiles its claims in Connecticut pursuant to the forum selection clause in the Individual Defendants' Agreements and consistent with Defendants' admission that the Individual Defendants and API are all subject to the Connecticut courts' personal jurisdiction. Additionally, following the TRO hearing, further investigation into the Individual Defendants' departure has revealed that Defendants misappropriated Acuren's trade secret information, thus giving rise to Acuren's DTSA claim asserted herein and federal question jurisdiction. Accordingly, Acuren files the instant action and asks that this Court enjoin Defendants' unlawful actions to avoid any further irreparable harm to Acuren's business relationships, employee relationships, reputation, and goodwill.

---

[2] In Harris County, Texas district courts, applications for temporary restraining orders are heard by an ancillary court (assigned on a two-week rotating docket) rather than the assigned district court to the case.

## THE PARTIES

6.      Plaintiff Acuren is a Delaware corporation with its principal place of business located at 14434 Medical Complex Drive, #100, Tomball, Texas 77377. Acuren is a global provider of industrial contracting services, focusing on non-destructive testing, inspection services, engineering services, and rope access work.

7.      Defendant Dillon is a former Acuren employee residing at 22223 Boulder Springs Lane, Tomball, Texas 77375.

8.      Defendant Villalta is a former Acuren employee residing at 26808 Hill and Dale Avenue, Splendora, Texas 77372.

9.      Defendant Perry is a former Acuren employee residing at 1302 Havelock Drive, Spring, Texas 77386.

10.      Defendant API is an Oklahoma corporation engaged in interstate commerce, doing business in multiple states. API's principal place of business is located at 17110 East Pine Street, Tulsa, Oklahoma 74116.

## JURISDICTION, VENUE, AND CHOICE OF LAW

11.      This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Acuren asserts claims for misappropriation of trade secrets under the DTSA, 18 U.S.C. § 1831 *et seq.*, against all Defendants.

12.      This Court has supplemental jurisdiction over Acuren's remaining claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims in this action over which the Court has original jurisdiction that they form part of the same case or controversy.

13.      In their respective Agreements, Acuren and the Individual Defendants agreed to the exclusive and personal jurisdiction of the state and federal courts located in Connecticut "for

the resolution of any dispute regarding or arising out of [the] Agreement." (*See* Exhibits 5-7.) API—who has knowledge of and relied on the forum selection clauses to seek dismissal of the Texas Action—has consented to this Court's jurisdiction.

14.      Accordingly, venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(3) because Defendants are subject to this Court's personal jurisdiction pursuant to the forum selection clause in the Agreements. Venue is proper in this district for the further reason that API tortiously interfered with a contract governed by Connecticut law and venue.

15.      The Agreements further provide that the "Agreement shall be construed and enforced in accordance with the substantive laws of the State of Connecticut." (*See* Exhibits 5-7.) Acuren maintains and does not waive its right to assert that Texas law is controlling as to all state law claims asserted herein. Nonetheless, for purposes of this Complaint, Acuren pleads the requisite elements and states claims for breach of contract and tortious interference with a contract—the only causes of action that arguably fall under the scope of the Agreements' choice of law provision—under both Texas and Connecticut law.

## BACKGROUND

The facts underlying Acuren's claims against Defendants are as follows:

### A.    Acuren's Business.

16.      Acuren is the largest non-destructive testing and non-destructive examination contractor in North America.[3] Since its inception in 1974, Acuren has been a trusted, single source

---

[3] The difference between non-destructive testing ("NDT") and non-destructive examination ("NDE") is very slight. In fact, the terms NDT and NDE are often used interchangeably. NDT is a testing and analysis technique used to evaluate materials and structures in order to identify defects and discontinuities. This type of testing can recognize faults and defects without causing damage to the original material or structure. Though NDT also is commonly referred to as NDE, there is, however, a slight difference between NDT and NDE. While NDT is restricted to testing, NDE includes both testing and the evaluation of the results. That is, NDT is used to locate defects in an asset while NDE is used to locate defects while also measuring the size, shape, orientation, and other physical characteristics of the defect. But, for purposes of this complaint, the term NDT will be used to refer to NDT and NDE services.

provider of technology-enabled asset protection solutions used to evaluate the structural integrity of critical energy, industrial, and public infrastructures.

17.    Acuren's clients rely on its NDT offerings to prevent critical failures and plant downtime. Put simply, no matter what structural integrity issue a client faces, clients can rely on Acuren to have the technicians and technology to fulfill their NDT needs. Acuren's NDT offerings to clients run the gamut—from capital construction projects to "call-out" and "nested" work (or "run and maintain" work). Acuren's offerings range from basic to advanced NDT services, as well as visual inspections and consulting services.[4]

18.    As just one example, and relevant to this action, Acuren performs both "call-out" work and "nested" work for its clients. For this type of work, Acuren's client is generally the operator or owner of the plant, and the work involves NDT inspection services on existing pipes already installed and located in a plant or a client facility. Distinguishably, though, "call-out" work is more intermittent and conducted on an as-needed basis, whereas "nested" work involves ongoing, scheduled inspection work performed by dedicated Acuren inspectors (or technicians) that work at the client's site on a regular basis. While call-out and nested work both primarily involve basic and/or advanced NDT services, the scope of such projects or work can also include visual inspections and consulting services.

19.    Acuren's client base is as diverse as Acuren's offerings. Acuren has NDT clients in the refinery, chemical, pipeline, storage tank, power generation, pulp & paper, aerospace, automotive, and pharmaceutical industries, among others.

---

[4] For example, Acuren offers radiographic testing for x-ray and gamma radiographic examination of weldments, castings, shop fabrication, and plant piping systems. It also offers ultrasonic testing for ultrasonic thickness measurement and ultrasonic flaw detection and other NDT and inspection methods, such as liquid penetrant examination, magnetic particle examination, and ground penetrating radar.

**B.    The Individual Defendants' Employment with Acuren.**

20.    Acuren hired Defendant Dillon on or about August 29, 2016, as a Radiographer. Dillon's initial duties at Acuren involved performing call-out and nested work at various locations and projects for Acuren's clients. Dillon was later promoted to Call-Out Operations Manager and then to Division Manager, with Acuren technicians reporting directly to him with regard to their call-out and nested work in both roles. Thus, from the inception of his career with Acuren, Dillon was interacting with and forming relationships with Acuren's clients and employees.

21.    Ultimately, on or around April 24, 2023, Acuren promoted Dillon to District Manager of its Houston office. In this role, Dillon was entrusted with the oversight and supervision of over three hundred Acuren technicians and their performance of call-out and nested work for Acuren's clients, as well as managing his direct Operation Manager reports.  Dillon was in charge of, and had P&L responsibility for, three divisions within Acuren: Acuren's Northwest Houston office, Acuren's La Porte, Texas call-out division, and Acuren's Angleton, Texas office. As District Manager, Dillon's duties also included developing and maintaining Acuren's client relationships, developing new business opportunities, meeting with clients, reviewing client contracts, conducting pricing assessments, negotiating pricing and rates with clients, reviewing client invoices and quotes, financial analyses of his divisions, and oversight of accounting functions (such as accounts payable and accounts receivable) for his divisions. While Dillon predominantly managed NDT call-out work for his divisions, he also was in charge of nested NDT work for multiple large clients of Acuren within Texas.

22.    Acuren hired Defendant Villalta on July 16, 2019, as a Multi-Certified NDT Level 2 Technician Tier II (RT/MT/PT/UT Level II) ("Technician") to perform call-out and nested work for Acuren's clients. Notably, Villalta was informed he would report to Dillon, who was a Call-

Out Operations Manager at the time. Prior to his resignation, Villalta was employed as an Operations Manager in Houston, still reporting to Dillon. In such role, Villalta was primarily responsible for managing Acuren's call-out technicians who performed the call-out and nested work within Dillon's divisions.

23.    Acuren hired Defendant Perry on July 22, 2020, as a Multi-Certified NDT Level 2 Technician Tier II (CR/RT/MT/PT/UTT/VT Level II) ("Technician") to perform call-out and nested work for Acuren's clients. Perry was likewise informed that his role reported to Dillon. Prior to his resignation, Perry was employed as an Operations Manager in Houston, again reporting to Dillon. In such role, Perry was primarily responsible for managing Acuren's casual (or short-term) employees employed to perform short-term projects.

24.    Each of the Individual Defendants were engrained in Acuren's call-out and nested NDT work and integral to Acuren's NDT inspection projects in Texas and other states. In his role as District Manager, Dillon acted as a primary client point of contact and interfaced with many of Acuren's institutional customers, such as Dragon Products, Ltd., Duphil, Inc., Arkema, Inc., Titan Industries, Inc., FlexSteel Pipeline Technologies, Inc., W-Industries, Inc., BASF Corporation, INEOS Styrolution America, LLC, Samsung Austin Semiconductor, LLC, Shell Oil Company, PMI Services North American, Inc., Deer Park Refining Limited Partnerships, Equilon Enterprises d/b/a Shell Oil Products—US, Weldfit Corporation dba Weldfit Energy Group, Kaneka Corporation, Devon Energy Production Company, L.P., and Devon Gas Services, L.P. Additionally, Villalta and Perry were each primary points of contact for the more than three hundred Acuren employees that reported up to Dillon. In short, during their tenure with Acuren, the Individual Defendants were familiar with the projects, pricing, inspection procedures, protocols, and employee compensation utilized by Acuren for call-out and nested NDT inspection

work.

C.    **Acuren Entrusted the Individual Defendants with Confidential and Trade Secret Information.**

25.    Given the nature of their job duties, and employment with Acuren for several years, the Individual Defendants were exposed to, entrusted with access to, and had deep familiarity with Acuren's proprietary, confidential, and trade secret information necessary to run Acuren's NDT inspection operations for call-out and nested work.

26.    Indeed, Acuren recruited, trained, and promoted key employees—like the Individual Defendants—and entrusted them with proprietary, confidential, and trade secret information regarding Acuren's NDT inspection business for call-out and nested work. Such proprietary, confidential, and trade secret information included, without limitation: (1) protected customer information (customer lists, job history, job schedules, pricing, rates, bids, quotes, opportunities, contacts, MSA terms and expiration dates, contracts, preferences, purchasing history, sales volume, frequencies/schedules, and reports); (2) protected employee information (employee lists containing contact information, compilations of job duties and responsibilities tailored to customer needs, compensation, and benefits); (3) protected financial and operational information (operational strengths and weaknesses, profit and loss information, revenue information, budgets and forecasts, business plans, growth and marketing strategies, growth for managing KPIs, marketing plans, and pricing strategies); (4) protected inspection manuals, methods, testing procedures, reports, and quality and safety programs; and (5) protected contractor and vendor information (preferred vendor sources for products, vendor purchasing histories, compilations of vendor pricing, rates, and services with relationship discounts, vendor lists containing contact information for key decision-makers, vendor preferences, contractor lists containing contact information, preferred contractors for certain geographic regions or customers,

contractor pricing, rates, discounts, and mark-ups, and specialized services performed by contractors).

27.     Acuren expended significant time, effort, and expense developing and maintaining its proprietary, confidential, and trade secret information, recruiting and training supervisors, managers, salespeople, and technicians to support their operations, and developing relationships with NDT customers—especially as it relates to nested and call-out NDT inspection work. Acuren invests significant time, money, and energy into researching customer needs, developing marketing plans, gathering financial data, revenues, and profit margins, creating pricing and discounts, building relationships with its customers, and developing its testing and safety processes, protocols, and procedures. Acuren's financial success and ability to compete in the NDT inspection business hinges on its proprietary, confidential, and trade secret information.

28.     Acuren, therefore, considers the confidential and trade secret information described throughout this Complaint as highly-sensitive, proprietary, and confidential and, as such, vigorously safeguards it. Acuren's trade secret information is not readily available to the public, nor readily ascertainable from information in the public domain. Thus, such information derives independent economic value by providing Acuren a competitive advantage in the market. Undoubtedly, Acuren would be unfairly and competitively disadvantaged if any employee—in this case, the Individual Defendants—improperly used or disclosed its trade secret information.

29.     Consequently, Acuren has implemented measures to preserve and protect the confidentiality of its proprietary, confidential, and trade secret information, which, among other things, include: (i) requiring employees to sign agreements in which they agree to keep Acuren's confidential information confidential (such as the Individual Defendants' Agreements); (ii) outlining policies for protecting Acuren's confidential information in the employee handbook; (iii)

restricting electronic access to certain information stored on Acuren's network; (iv) limiting access rights to certain folders stored on Acuren's network; (v) password protecting certain folders containing electronically stored confidential or trade secret information; (vi) requiring employees to attend annual training (as to their obligations to protect Acuren's confidential information and not use or disclose such information for the benefit of others); and (vii) including confidentiality disclaimers on emails transmitted to third parties.

30.     Because the success of any company, particularly one that provides such specialized inspection services, fundamentally depends on its proprietary, confidential, and trade secret information, it is imperative that Acuren's confidential and trade secret information be kept in strict confidence. Otherwise, Acuren will lose its ability to compete in the marketplace. Indeed, this is the very reason Acuren required the Individual Defendants to sign, as a precondition to their employment, their respective Agreements, which specifically require them to—among other things—protect Acuren's proprietary, confidential, and trade secret information.

**D.      Dillon, Villalta, and Perry's Non-Solicitation Agreements.**

31.     As a condition of their employment with Acuren, Dillon, Villalta, and Perry each executed, upon the start of their employment with Acuren, the Agreement containing provisions related to their duty of loyalty, confidentiality, and non-solicitation obligations. (*See* Exhibits 5- 7.) In relevant part, Dillon, Villalta, and Perry agreed to a "Best Efforts and Duty of Loyalty" provision, promising that:

> During the term of Employee's employment with [Acuren], Employee will devote his/her full time, energy and best efforts to the furtherance of the business of [Acuren] and agrees not to act in a manner that conflicts with the best interests of [Acuren].

(*See id.*)

32.     Additionally, Dillon, Villalta, and Perry agreed to a "Nonsolicitation of

11

Employees and Customers" covenant. (*Id*.) Specifically, the respective Agreements provide that:

> During the term of Employee's employment with [Acuren] and for twelve (12) months immediately thereafter, Employee agrees not to directly or indirectly (a) solicit, encourage or attempt to induce any employee of [Acuren] with whom Employee dealt or about whom Employee had access to confidential information to terminate their employment with [Acuren] or (b) other than on behalf of [Acuren], to sell, attempt to sell, or assist in selling any products or services to any actual or prospective customer of [Acuren] with whom Employee dealt or about whom Employee had access to Business Information during the last twelve months of Employee's employment with [Acuren.]

(*Id*.)

33.    Dillon, Villalta, and Perry also agreed to a "Business Information; Confidential Information of Others" covenant.  Specifically, the respective Agreements provide that:

> Employee will not at any time during Employee's employment by [Acuren] or thereafter use or disclose to others any Business Information except as specifically authorized by [Acuren] or as may be required in the performance of Employee's duties for [Acuren].

(*Id*.)  "Business Information" is defined in the Agreements as "any and all of Acuren's trade secrets, confidential or proprietary information, and all other information and data that is not generally known to third persons who could derive economic value from its use or disclosure."

34.    Finally, the Agreement required that "[a]ll tangible materials, equipment . . . that Employee receives . . . in the course of employment with [Acuren] are and shall remain the property of [Acuren] and Employee agrees to immediately return such property to [Acuren] . . . upon the cessation of Employee's employment with [Acuren]." (*Id*.)

> **E.    The Individual Defendants' Mass Resignation from Acuren to Join API.**

35.    API, like Acuren, offers NDT inspection services on radiography, heat treating, pipeline integrity, and mechanical integrity, among other services. Headquartered in Tulsa, Oklahoma, API engages in interstate commerce with locations throughout Oklahoma, Ohio, North Dakota, New Mexico, and Texas and competes with Acuren in these locations.

36.     On or about April 16, 2024, Acuren discovered that Dillon had received a written offer letter from API dated April 1, 2024 ("Offer Letter"). (*See* API Offer Letter to Dillon, attached hereto as <u>Exhibit 9</u>.) In fact, Dillon advised Acuren of API's efforts to recruit him and provided Acuren a copy of the Offer Letter. The Offer Letter noted that Dillon's title at API would be "Operations Manager" and went on to outline API's proposed compensation, including a salary, vehicle allowance, signing offer, and commission. (*Id*.) Notably, neither Dillon's deadline for accepting API's offer nor Dillon's signature line are visible in the version provided to Acuren. (*Id*.)

37.     In part because of Dillon alerting Acuren to API's latest efforts to disrupt Acuren's business, Acuren mistakenly believed that Dillon was loyal to Acuren and did not have any intentions to join API. Therefore, it came as a complete surprise when Acuren learned that the Individual Defendants—including Dillon—all unexpectedly resigned from Acuren on Monday, April 29, 2024. Upon information and belief, Villalta and Perry submitted their resignation notices to Dillon on April 26, 2024, but Dillon concealed these resignations from Acuren until the following Monday so as to limit Acuren's ability to make efforts to convince Villalta and Perry to remain employed with Acuren. (*See* <u>Exhibit 2</u> at ¶ 14.)

38.     Given Dillon's critical role and the potential impact his abrupt resignation would have on the hundreds of Acuren employees under him, Dal Miller, Acuren's EVP of US Operations, arranged to meet with Dillon in Houston that evening. In an effort to convince Dillon to stay, Acuren offered to match API's offer. Based on their conversations, Miller believed Dillon intended to stay with Acuren.

39.     Instead, Dillon officially resigned on the morning of Wednesday, May 1, 2024, to join API.  Villalta and Perry also followed Dillon and joined API.

**F.    The Individual Defendants' Unlawful Departure.**

40.    Upon information and belief, API hired Dillon and the other Individual Defendants to grow its NDT inspection services in Texas (and surrounding areas) by luring away experienced Acuren employees, commandeering Acuren's Business Information and trade secrets, and stealing Acuren's existing nested and call-out work with Acuren's clients. API knew that hiring Acuren employees with years of API training and experience and knowledge regarding Acuren's client base, client needs, and trade secrets would provide API with a short-cut to growing its own business as well as an unfair competitive advantage.

41.    Indeed, Acuren has learned that in or around March of 2024, Dillon attended a lunch with API representatives. (*See* Exhibit 2 at ¶¶ 4-6.)  The lunch meeting was held at the Pappasito's Cantina located at 7050 FM 1960 Road West, Houston, TX 77069, where Dillon met with David Alcorn, API's President (the "Meeting"). (*Id*. at ¶¶ 4-5.) At this Meeting, Alcorn discussed the compensation necessary to convince Dillon to join API as well as Dillon's ability to recruit Acuren's technicians and bring Acuren's clients with him to API. (*Id*. at ¶ 6.)

42.    Notably, this is not the first time API has resorted to unlawful means in its efforts to disrupt Acuren's business. In fact, Acuren currently has two other similar lawsuits pending against API, both of which have thus far resulted in agreed preliminary injunctions prohibiting, among other things, the solicitation of Acuren's employees, the use of Acuren's trade secrets and confidential information, and the disparagement of Acuren by Acuren's former employees that joined API. *See Acuren Inspection, Inc., et al. v. Darren Sims, et al.*, Civil Action No. CIV-23-00979-JD, in the United States District Court for the Western District of Oklahoma ("Sims Action"); *Acuren Inspection, Inc., et al. v. Kenneth Grimes, et al.*, Civil Action No. 4:23-cv-03628, in the United States District Court for the Southern District of Texas, Houston Division ("Grimes

Action").

43.     Despite having agreed to the two existing preliminary injunctions, once again, API has engaged in unfair and unlawful business practices against Acuren, this time by entreating Dillon to recruit Acuren's employees and clients with full knowledge of Acuren employees' contractual obligations and fiduciary duties and to steal Acuren's trade secrets for API to gain an unfair competitive advantage in the NDT inspection marketplace. API was fully aware of the terms of the Individual Agreements because the former employees in the Sims Action likewise have customer and employee non-solicitation covenants. Thus, upon information and belief, API tortiously interfered with Acuren's contracts with the Individual Defendants by knowingly encouraging and participating in Dillon's efforts to recruit Acuren employees and clients to leave Acuren for API and to sow seeds of discord by disparaging Acuren prior to their own resignation.

44.     Following the Meeting with Alcorn, ***and while still employed by Acuren***, Dillon began aggressively organizing a mass exodus of Acuren employees and clients to API. (*Id*. at ¶¶ 9-10, 12-13.) Dillon's efforts to solicit Acuren employees and clients also began *after* he received a lucrative job offer from API. Dillon went so far as to provide API a list of all of the Acuren employees to make offers to and the compensation packages to offer each to guarantee such employees would leave Acuren for API—all while still employed by Acuren.

45.     Specifically, Dillon targeted the Acuren employees that reported to him in his role as Division Manager, aggressively soliciting them to join him at API. (*Id*. at ¶ 9.) Dillon met with his technicians and other Acuren employees who reported up to him during business hours and informed the employees of his intentions to leave Acuren, that there will be API job postings following his departure, and he encouraged the employees to apply and join him at API. (*See id*.) Dillon also assisted in negotiating job offers on behalf of the employees he recruited, including

Villalta and Perry. (*Id.* at ¶ 13.) To ensure API's job offers were sufficiently attractive, Dillon provided API with Acuren's employee and compensation information—information Acuren maintains is confidential. (*Id.*)

46.     Dillon also began openly disparaging Acuren in an effort to convince Acuren employees to leave Acuren for API. Specifically, upon information and belief, Dillon informed employees that Acuren had lost a big contract (far in excess of the monetary value of the client contract Acuren actually lost) and did not have work for its Houston employees, representations that were completely inaccurate.

47.     By early April 2024, and before disclosing the Offer Letter to Acuren, Dillon was actively soliciting Acuren's clients on behalf of API, informing them of his impending departure and encouraging them to bring their business to API. (*Id.* at ¶ 10.) Dillon arranged meetings with significant clients like Weldfit, Performance, Devon Energy, Oneok, and Kaneka. (*See* Text Messages from Dillon, attached to Exhibit 2 as Exhibit A.) Notably, Dillon believed having Weldfit alone "LOCKED in" was sufficient to support "ALL of our indirect salaries," presumably referring to the anticipated compensation of the Acuren employees he recruited for API. (*Id.*) Upon information and belief, Dillon relied on trade secrets and Business Information of Acuren (such as Acuren's rates) to solicit Acuren's clients and convince them to switch their NDT business to API.

48.     Dillon was successful in soliciting Kaneka, Devon Energy, and Weldfit to transfer their NDT inspection business to API. These clients informed Acuren, within days of Dillon resigning, that they would be using API for their inspection needs. Acuren has reason to believe that Dillon, while still employed by Acuren, (i) provided API tailored rate information to ensure these Acuren clients would switch their business to API by relying on Acuren's confidential and

trade secret pricing and rate information, and (ii) ghost wrote for API the emails to send to these clients about transferring their business from Acuren to API (in an effort to make Dillon's and API's unlawful solicitation efforts look legitimate). But not only did Dillon and API unlawfully steal this business from Acuren, upon information and belief, they—along with the help of Villalta and/or Perry—also successfully solicited several Acuren employees to quit Acuren between May 1 and May 4, 2024, to join API. Indeed, at least nine Acuren technicians who reported directly to Villalta, Dillon, or Perry voluntarily terminated their employment with Acuren at the beginning of this month (May 2024) with the termination reason listed (for most, if not all) as "Quit-Competitor." These nine Acuren employees were associated with the clients lost to API as a result of Defendants' unlawful conduct—Weldfit, Kaneka, and Devon Energy.

49.     API similarly encouraged other Acuren recruits to solicit Acuren technicians and clients on behalf of API. (*See generally* Exhibit 2.) Thus, upon information and belief, Villalta and Perry were also involved in the solicitation of Acuren employees and clients prior to their resignation. But clearly, Dillon was the ringleader of this orchestrated plan between himself and API—concocted while he was still employed by Acuren and receiving a six-figure salary—to steal Acuren's highly trained employees and lucrative client contracts.

### G.     Defendants misappropriated Acuren's Trade Secrets and Business Information.

50.     Believing that Dillon had relied on and provided API with Acuren's Business Information to assist in the solicitation of Acuren's employees and customers, Acuren conducted forensic investigations following the Individual Defendants' departure from Acuren. Acuren has discovered that, prior to their resignation, the Individual Defendants unlawfully misappropriated the highly sensitive, confidential, and trade secret information which Acuren entrusted them to safeguard and use only for the advancement of Acuren's business.

17

51.     As of the filing of the Texas Action, Dillon had failed to return one of his Acuren-issued laptops to Acuren, as required by his Agreement and under applicable law. While Dillon returned *a* laptop upon his resignation, upon information and belief, he did not return the laptop used by him to perform his work for Acuren.

52.     Nevertheless, Acuren forensically examined the laptop Dillon did return upon resignation (a Dell Precision 7700 (2GK3)), which showed the user profile "ryan.dillon" used the laptop as recently as April 26, 2024.

53.     Specifically, the user profile "ryan.dillon" connected two separate USB devices to the Dell laptop, one on April 17, 2024, and another on April 26, 2024. Notably, no USB devices had previously been connected to the computer since September 2023.  This fact, coupled with the timing of the USB devices being connected right before Dillon resigned, lead to a strong conclusion that Dillon may have used the devices to abscond with Acuren's Business Information and trade secrets.

54.     On April 17, 2024, a file named "Kaneka Rate Sheet.docx" was created on/saved to the VendorCo ProductCode USB Device while connected to the Dillon laptop. This file was created on the USB device by the "ryan.dillon" user profile 15 seconds after a file by the same name (located at C:\Users\ryan.dillon\OneDrive - Acuren Inspection, Inc\Department 400\Quotes\*Quoted by Ryan Dillon*\3J-RYAN) had been opened by the "ryan.dillon" user profile on the Dillon Laptop (emphasis added). The file (a Word document), created on April 17, 2024, contains API's logo and address in the header and then "Kaneka 'Nested' Rates" with labor and equipment rates listed.

55.     As discussed above, Kaneka is one of the clients Dillon successfully solicited while still employed by Acuren (as Kaneka has already indicated to Acuren it will be switching

its call out work to API). Given that Dillon created this API rate/pricing sheet while still employed by Acuren, and while presumably reviewing an Acuren rate sheet for the same customer (based on the Acuren OneDrive directory accessed by Dillon right before creating this rate sheet for API), Dillon used Acuren's confidential client rate information to prepare a business document for Acuren's competitor—all for the purpose of stealing Acuren's client.

56.     Additionally, while the USB device was connected on April 17, 2024, the "ryan.dillon" user profile accessed OneDrive directories on the laptop, including one titled "Quotes\Quoted by Ryan Dillon\3J-RYAN."  The user accessing this directory could have copied all of its contents onto the connected USB device by dragging and dropping the files, without any forensic trace on the laptop that such files were taken. The name of the folder/directory denotes it likely contains confidential and trade secret files of Acuren.  The USB device connected on April 17, 2024 was not returned to Acuren.

57.     Similarly, while another VendorCo ProductCode USB device was connected to the Dillon Laptop on April 26, 2024, the "ryan.dillon" user profile accessed multiple directories on the laptop, with such titles as:

- 400 Scheduling\Technician Info
- Desktop\Dragon Certs
- Sales Approach Div 400
- Sales Leads
- W-Industries
- Department 404

Again, the user accessing these folders/directories could have copied all (or some) of their contents onto the connected USB device by dragging and dropping the files, without any forensic trace on the laptop that such files were taken.  The directory names denote these folders likely contain confidential and trade secret files of Acuren.  The "Department 404" directory alone has

thousands of files located within it, with various file names having the terms "Rate Sheet," "Rates," or "Quote" in the file name.

58.     As Dillon was still in possession of the computer at the time of this user activity on April 17 and 26, 2024, and the name of the user profile is "ryan.dillon," the reasonable conclusion is that Dillon engaged in the foregoing conduct.

59.     After the initiation of the Texas Action, Dillon returned to Acuren a second laptop, a Dell Latitude. This laptop showed the user profile "Ryan.Dillon" used the laptop as recently as April 30, 2024. Two separate USB devices were connected to the laptop by the "Ryan.Dillon" user profile close to Dillon's resignation from Acuren, one on April 18, 2024, and another on April 22, 2024. The device connected on April 18, 2024, a VendorCo ProductCode USB Device, is the same USB device connected to the other Dillon laptop on April 17, 2024.  This device has (or at least had as of April 2024) files stored on it titled "Devon Energy.docx," "1-8-2022 – Devon Energy – Acuren Inspection – RT Day Rate Pricing – Rev.1.docx," and "Technician Info.xlsx."

60.     The forensic analysis of a Dell laptop (Dell Precision 7700 (LST3)) returned by Perry shows two USB devices connected around the time of Perry's resignation from Acuren—one connected on April 22, 2024, and disconnected on April 26, 2024 (titled "Brian's S22 Ulta"), and another connected on April 30, 2024, but first connected on April 24, 2023, to the laptop and titled "easystore 2648". Again, a USB device had not been connected to the computer since October 2023.  The name of one of the external devices—*i.e.,* "Brian's S22 Ulta—indicates the USB device belongs to Perry. As for the other device, the easystore 2648, this device had been connected to the laptop off and on over the last few years and files opened on the computer from the device seem to indicate the easystore belongs to Perry—*i.e.*, a file titled "Brian Perry API offer Signed 4-8-24.pdf".  Further, artifacts from the Perry Dell laptop indicate the user profile

"brian.perry" accessed files on the easystore device from the laptop.

61.    While the "Brian's S22 Ulta" USB device was connected between April 22 and 26, 2024, to the Perry Dell laptop, directories on the laptop were accessed, with such titles as:

- 400 Scheduling\Request Folder
- Div 499 New hire Personal Info\NDE

Again, the user accessing these folders/directories could have copied all (or some) of their contents onto the connected USB device by dragging and dropping the files, without any forensic trace on the laptop that such files were taken.  The directory names denote these folders likely contain confidential and trade secret files of Acuren.

62.    One of the specific files accessed on April 25, 2024, while the "Brian's S22 Ulta" USB device was connected to the Dell laptop, is a spreadsheet titled "Gulf Coast_TAR Outlook & Staffing Performance_2024.04.25R1.xlsx." Upon review of this file located at C:\Users\brian.perry\OneDrive - Acuren Inspection, Inc\02. GC_TAR OUTLOOK\Gulf Coast_TA OUTLOOK SCHEDULE CALL, one tab of this spreadsheet includes the "2024-Turnaround Outlook Schedule" with columns for the "Client," "Location," "Unit," "Month," "Date," "Year," and "Duration," with "COMMENTS" and "FOLLOWUP" columns completed for several of the spreadsheet entries, and another tab listing, among other items, columns for "Total Staffing Needs," "Pot. Revenue (Labor Only)," and "Actual Revenue (Labor Only)" for the "Client" entries listed.

63.    Upon information and belief, based on the timing of the access of this file (i.e., after Perry had already decided to join API and two business days before he submitted his resignation), Perry stole this scheduling and revenue file containing Acuren's Business Information and trade secrets, to use in his employment with, and for the benefit of, API.

64.    A second computer returned by Perry (a Lenovo ThinkPad JML3 WC) also had

connected to it the same easystore 2648 USB device. This device had been connected to the Lenovo laptop on numerous dates including April 24, 2024, and last disconnected from the Lenovo laptop on April 26, 2024. While the easystore 2648 USB device was connected between April 24 and 26, 2024, to the Perry Lenovo laptop, directories on the laptop were accessed, with such titles as:

- 400 Scheduling
- 02. GC_TAR OUTLOOK

Again, the user accessing these folders/directories could have copied all (or some) of their contents onto the connected USB device by dragging and dropping the files, without any forensic trace on the laptop that such files were taken.

65.     The forensic analysis of the laptop returned by Villalta (a Dell Latitude 8GK3 MC) shows multiple USB devices connected to the laptop by the user profile "Jesus.Villalta" with folders located on certain of the devices titled "Acuren Level 3 Exams" and "Jr's Work Stuff\Versa."[5] Villalta did not return these external storage devices to Acuren.

66.     As the preceding demonstrates, the Individual Defendants unlawfully perpetrated the theft of Acuren's proprietary, confidential, and trade secret information, beginning while still employed by Acuren and continuing into their employment with API. Further, since the Individual Defendants began acting on behalf of API while still employed by Acuren and during the time of the preceding computer-related activity, Defendants have succeeded in stealing Acuren's trade secrets, employees, and client work. Acuren has no doubt that Defendants could not have successfully solicited its employees or obtained this client work without relying on Acuren's Business Information and trade secret information unlawfully taken by the Individual Defendants

---

[5] Versa is a company that Acuren's parent acquired in November 2022.

when they departed to join API.

       **H.**    **Defendants' unlawful actions must be restrained to avoid harm to Acuren.**

      67.    API aggressively recruited Acuren employees for its own benefit, and the Individual Defendants violated long-standing restrictive covenants and breached fiduciary duties owed to Acuren as their employer. Defendants conspired to tortiously interfere with Acuren's business relationships and to unfairly compete with Acuren. Indeed, the string of secretly orchestrated departures, as well as the perpetrated theft of Acuren's Business Information and trade secrets, has permitted API to unfairly steal Acuren's employees and business with Acuren's customers, including Weldfit, Devon Energy, and Kaneka

      68.    Upon information and belief, Dillon, Villalta, and Perry are all violating the non-solicitation covenants in their Agreements by recruiting Acuren employees and clients. The Individual Defendants are also in breach of their plainly stated confidentiality obligations in the Agreement and have unlawfully taken Acuren's Business Information and trade secrets in violation of federal and state law. Additionally, Dillon openly breached his duties of loyalty when, while still an employee of Acuren, (i) he disparaged Acuren to other employees, including his present and/or former direct reports, (ii) orchestrated a mass resignation of Acuren employees on the same day designed to cripple Acuren's ability to continue its Texas operations, and (iii) solicited Acuren employees and clients to join Acuren's competitor API. By such actions, Dillon leveraged his position as Acuren's trusted senior-level management-employee to the detriment of Acuren. Finally, API—despite its experience, knowledge, and agreement regarding the various covenants and duties owed to Acuren by its employees—continues to recruit and mobilize Acuren's employees to unlawfully disrupt Acuren's business and to tortiously interfere with Acuren's client relationships to steal Acuren's call-out and nested client work in Texas.

Defendants' brazen conduct underscores the fact that Defendants' wrongful conduct will continue without court intervention.

69.     The resignation of the Individual Defendants, in light of their respective roles, and the discourse initiated by Dillon's actions and statements, will cause irreparable harm to Acuren. More specifically, Acuren is not only at risk of losing employees it trained and made significant investments in and significant revenue from its clients, but also faces the loss of morale and the trust of its remaining employees who are suddenly left without leadership and with fabricated insecurity regarding the availability of work at Acuren. Further, given the competitive nature of Acuren's business and the vitality of the Business Information (as defined in the Agreements) to its financial success, harm is exceedingly imminent to Acuren if Defendants are allowed to continue using and/or disclosing Acuren's Business Information and trade secrets for their benefit. Therefore, Defendants' violations of law will continue to cause Acuren irreparable harm unless this Court enjoins their impermissible activities.

## CAUSES OF ACTION

Based on the factual allegations in this Complaint, Acuren asserts the following causes of action against Defendants.

### COUNT I – BREACH OF CONTRACT[6]
*Against Defendants Dillon, Villalta, and Perry*

70.     Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

71.     Dillon, Villalta, and Perry, each individually, entered into an enforceable Agreement containing confidentiality and non-solicitation covenants with Acuren. (*See* Exhibits

---

[6] Acuren asserts its breach of contract claim in accordance with Connecticut law, but does not waive its right to assert that Texas law should apply. Further, Acuren maintains that it can state a valid breach of contract claim against the Individual Defendants under either state's laws.

5-7.) The obligations and protections in the Agreements run in favor of Acuren,

72.    Each Individual Defendants' hiring was conditioned upon his signing of the Agreement and the Individual Defendants did, in fact, continue to work for Acuren after signing the Agreement, benefitting from their employment, promotions, and/or access to Acuren's Business Information.

73.    In the Agreements, Dillon, Villalta, and Perry agreed that:

- During the term of Employee's employment with [Acuren], Employee will devote his/her full time, energy and best efforts to the furtherance of the business of [Acuren] and agrees not to act in a manner that conflicts with the best interests of [Acuren].

and

- During the term of Employee's employment with [Acuren] and for twelve (12) months immediately thereafter, Employee agrees not to directly or indirectly (a) solicit, encourage or attempt to induce any employee of [Acuren] with whom Employee dealt or about whom Employee had access to confidential information to terminate their employment with [Acuren] or (b) other than on behalf of [Acuren], to sell, attempt to sell, or assist in selling any products or services to any actual or prospective customer of [Acuren] with whom Employee dealt or about whom Employee had access to Business Information during the last twelve months of Employee's employment with [Acuren.]

and

- Employee will not at any time during Employee's employment by [Acuren] or thereafter use or disclose to others any Business Information except as specifically authorized by [Acuren] or as may be required in the performance of Employee's duties for [Acuren].

(Exhibits 5-7.) The Individual Defendants also agreed to return all tangible materials, equipment, etc. acquired in the course of their employment with Acuren to Acuren "upon the cessation of Employee's employment with [Acuren]." (*Id.*)

74.    "Business Information" is defined in the Agreements as "any and all of Acuren's trade secrets, confidential or proprietary information, and all other information and data that is not

generally known to third persons who could derive economic value from its use or disclosure." (*Id.*)

75.     The Agreements are valid and enforceable contracts.

76.     The Agreements protect Acuren's legitimate business interests, including its Business Information and its client and employee relationships.

77.     The Agreements' terms are reasonable in that the non-solicitation covenants (as to employees and clients) are temporally limited to only twelve (12) months post-employment. The scope of the non-solicitation covenants is further limited to only those employees with whom the Individual Defendants dealt or about whom the Individual Defendants had access to confidential information and those customers with whom the Individual Defendants dealt or about whom the Individual Defendants had access to Business Information during the last twelve months of their employment with Acuren.

78.     These terms are fair and reasonable in order to protect Acuren's legitimate business interests.

79.     The Individual Defendants' Agreements do not harm or interfere with the public interest.

80.     The terms of the Agreements do not pose an undue hardship on the Individual Defendants.

81.     Acuren has fully performed its contractual obligations to the Individual Defendants under their respective Agreements.

82.     The terms of the Agreements are not greater than required for the protection of Acuren's legitimate business interests, including its Business Information and goodwill with its employees and customers.

83.     Dillon, Villalta, and Perry breached their respective Agreements by: (i) acting in a manner that was to the detriment of Acuren (and not in Acuren's best interests) and (ii) soliciting Acuren employees and customers. Additionally, Dillon used and disclosed to API Acuren's Business Information, including employee compensation and benefits information, to enable API to lure Acuren's employees away from Acuren. Dillon likewise used Acuren's Business Information regarding its clients to solicit Acuren's clients to switch their contracts and business to API. On information and belief, Villalta and Perry also used or disclosed Acuren's Business Information in a manner not specifically authorized by Acuren and outside of the performance of the Individual Defendants' duties to Acuren.

84.     Acuren has suffered and will continue to suffer damages as a result of the Individual Defendants' breaches of contract, which are ongoing and expected to continue, including diminished value of its Business Information, damaged goodwill with customers and employees, and loss of its competitive advantage.

85.     The amount of Acuren's damages are not presently ascertainable and cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

86.     Based on Dillon, Villalta, and Perry's actions, it is clear that they will continue to violate their respective Agreements and, as a result, cause irreparable injury to Acuren, unless this Court enjoins them from doing so.

87.     If this Court were to grant injunctive relief to Acuren, the burden on the Individual Defendants would be slight compared to the injury to Acuren if injunctive relief is not granted.

88.     Granting an injunction will not harm the public interest.

89.     Acuren seeks entry of a Temporary Restraining Order, Preliminary Injunction,

and Permanent Injunction against the Individual Defendants, enjoining them—consistent with the terms of their respective agreements—from soliciting Acuren's employees and customers and from using or divulging Acuren's Business Information.

90.    Acuren demands that Dillon, Villalta, and Perry be ordered to pay for all of their incurred damages resulting from the foregoing breaches.

91.    Acuren further seeks attorneys' fees and costs and such other and further relief the court deems just.

### COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT
### *Against Defendant API*

92.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

93.    As described in this Complaint, Acuren has a valid and enforceable contract with Dillon, Villalta, and Perry in which they promised, among other things, to act in Acuren's best interests, not to solicit Acuren's employees or customers, and not to use or disclose Acuren's Business Information.

94.    The Individual Defendants left their employment with Acuren to work for API in roles substantively similar and directly competitive to their former roles at Acuren.

95.    API had knowledge of the Individual Defendants' Agreements with Acuren and knew that it prohibited the Individual Defendants from soliciting Acuren's employees and customers and using or disclosing Acuren's Business Information.  Nonetheless, API had at least one meeting with Dillon during which it encouraged him to leave Acuren and contemplated whether Dillon could recruit Acuren employees and take Acuren clients with him to API. Further, in its efforts to lure away Acuren's employees, API relied on Dillon's disclosure of confidential employee information to which he was privy as a fiduciary of Acuren in order to make competitive

offers of employment. On information and belief, API has similarly encouraged Villalta and Perry to act in a manner that conflicts with the best interests of Acuren, including the solicitation of Acuren's employees and customers.

96.    API has willfully and intentionally interfered with the Individual Defendants' respective Agreements with Acuren.

97.    API has willfully and intentionally induced, or attempted to induce, the Individual Defendants to act in a manner that conflicts with the best interests of Acuren, to solicit Acuren employees and customers, and disclose Acuren's Business Information.

98.    API's interference is not privileged or justified.  As a result of API's interference with Acuren's existing contracts with Dillon, Villalta, and Perry, Acuren has suffered actual damages and irreparable harm, including, among other things, loss of goodwill, loss of value in their contractual relationships with employees and customers, diminished value in its Business Information, damage to its reputation, and other pecuniary loss.

99.    Based on API's unlawful interference, Acuren is entitled to all actual damages proximately caused by API's acts of interference.  Additionally, Acuren is entitled to exemplary damages because API's acts of interference were willful and malicious.

100.    Acuren's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

101.    Given that API was undeterred by previous litigation, API will inevitably continue its interference with Acuren's existing contracts with Dillon, Villalta, and Perry and other Acuren employees, which will irreparably injure Acuren, unless this Court enjoins its improper activities. Acuren, therefore, is also entitled to injunctive relief to prevent this tortious interference in the future.

**COUNT III – VIOLATION OF DEFEND TRADE SECRETS ACT**
*Against All Defendants*

102.    Acuren incorporates by reference each of the foregoing paragraphs as if full set forth in this count.

103.    Acuren possess highly unique and valuable information related to its NDT inspection services for call-out and nested work—specifically, as relevant to this Complaint: (1) protected customer information (customer lists, job history, job schedules, pricing, rates, bids, quotes, opportunities, contacts, MSA terms and expiration dates, contracts, preferences, purchasing history, sales volume, frequencies/schedules, and reports); (2) protected employee information (employee lists containing contact information, compilations of job duties and responsibilities tailored to customer needs, compensation, and benefits); (3) protected financial and operational information (operational strengths and weaknesses, profit and loss information, revenue information, budgets and forecasts, business plans, growth and marketing strategies, growth for managing KPIs, marketing plans, and pricing strategies); (4) protected inspection manuals, methods, testing procedures, reports, and quality and safety programs; and (5) protected contractor and vendor information (preferred vendor sources for products, vendor purchasing histories, compilations of vendor pricing, rates, and services with relationship discounts, vendor lists containing contact information for key decision-makers, vendor preferences, contractor lists containing contact information, preferred contractors for certain geographic regions or customers, contractor pricing, rates, discounts, and mark-ups, and specialized services performed by contractors). This compiled information is confidential, proprietary, not generally known to the public, and constitutes trade secrets within the meaning of the DTSA.

104.    Acuren's principal place of business is in Texas, but it operates in almost every other state in the United States. It also regularly transacts business in states other than Texas,

including in person and by phone, internet, and mail. Acuren's trade secrets relate to this business and Acuren uses them in interstate commerce.

105.    Acuren has taken reasonable measures to keep this information secret and confidential, including but not limited to requiring its employees with access to this information to sign confidentiality or other restrictive covenant agreements, requiring employees to abide by confidentiality and IT usage policies, password-protecting access to certain of Acuren's electronically stored information, physical and technical security measures related to its offices, limiting access rights to certain information, and using confidentiality disclaimers on emails transmitted to third parties.

106.    This information has independent economic value because it is not generally known to, and is not readily ascertainable by proper means by, persons other than Acuren who could obtain economic value from its disclosure or use. Acuren compiled its confidential and trade secret information over many years and at great expense.

107.    Defendants, by engaging in and continuing to engage in the conduct and activities described herein, have violated the DTSA through their improper acquisition, disclosure, and use of Acuren's trade secrets, which constitute actual and threatened misappropriation. The Individual Defendants perform and/or have performed essentially the same work for API that they performed for Acuren. The Individual Defendants had, and continue to have, access to, and possession of, Acuren's trade secrets.

108.    Defendants have actually used, plan to use, and will inevitably use Acuren's trade secrets. Given the similarities between the Individual Defendants' work for API and Acuren—and the fact that API and Acuren are direct competitors—it is inevitable and threatened that the Individual Defendants will use and/or disclose Acuren's trade secrets in their work for API.

Further, upon information and belief, the Individual Defendants stole Acuren's files containing proprietary, confidential and trade secret information and have failed to return external storage devices and electronically stored information to Acuren, despite the Individual Defendants' obligation to do so.

109.    Defendants are using Acuren's trade secrets (as identified *supra* in paragraph 103) to solicit and service Acuren's customers, to solicit Acuren's employees, and to operate a competing inspection business through improper, unfair practices.

110.    Defendants owed, and continue to owe, Acuren a duty to maintain the secrecy of its information. Defendants knew or had reason to know, and continue to know or have reason to know, of that duty at the time they misappropriated Acuren's trade secret information without Acuren's consent.

111.    Acuren has suffered and will continue to suffer irreparable harm because of Defendants' unlawful conduct and the disclosure and misappropriation of trade secret information. Defendants' activities will result in a substantial loss of business for Acuren, now and in the future. Acuren has no adequate remedy at law because Defendants' actions are affecting its goodwill, reputation, and ability to compete in a highly competitive marketplace. Thus, Acuren is entitled to injunctive relief to prevent further irreparable harm under the DTSA.

112.    Defendants' actions were willful, malicious, and intended to injure Acuren and its business.

113.    As a direct and proximate result of Defendants' misappropriation, Acuren has suffered irreparable harm, injuries, and damages, and will continue to suffer irreparable harm, injury, and damages—including but not limited to loss of relevant market share, injury to business reputation and goodwill, loss of profits, and attorneys' fees and costs. Defendants have gained an

unfair competitive advantage and other unjust enrichment through the misuse of Acuren's trade secrets.

114.    Under the DTSA, Acuren is entitled to and seeks a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction against Defendants to enjoin their use of Acuren's trade secrets.

115.    Further, under the DTSA, Acuren is entitled to and requests an award of damages in its favor for actual loss caused by the misappropriation, damages for all unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss, and/or damages measured by imposition of liability for a reasonable royalty for the unauthorized disclosure or use of Acuren's trade secrets.

116.    Finally, under the DTSA, Acuren is entitled to and requests exemplary damages in an amount not more than two times Acuren's actual damages, plus reasonable attorneys' fees.

### COUNT IV – BREACH OF FIDUCIARY DUTY/KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTIES[7]
### *Against Defendants Dillon and API*

117.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

118.    Dillon had a fiduciary relationship with Acuren.

119.    Dillon owes a fiduciary duty to Acuren arising from his position as a former officer of Acuren and based on his relationship with, and work for, Acuren. Specifically, Dillon owed Acuren a duty to act primarily in his employer's interest, to deal openly and fully disclose information about matters affecting the company's business, not to use his position for personal gain at Acuren's expense, and not to use Acuren's property and information for his own purpose

---

[7] Counts IV through X are asserted pursuant to Texas law because they are outside the scope of the choice of law provision in the Individual Defendants' Agreements and Texas has the most significant relationship to these claims.

or the purpose of any third person.

120.    Dillon breached his fiduciary duties of loyalty and confidence to Acuren when he enacted plans to sabotage Acuren's business operations. For example, Dillon failed to deal openly with Acuren when he opted to refrain from timely disclosing his intention to leave Acuren and join API.   Instead, Dillon conspired to leave Acuren and to induce other Acuren employees and customers to leave and join Acuren's competitor, API.  Dillon further failed to act primarily in Acuren's interest by instilling discord among Acuren's employees by openly disparaging Acuren on Acuren's campus and during work hours. Dillon perpetrated the preceding conduct in a manner adverse to Acuren's interests and without Acuren's consent.

121.    Upon information and belief, API knew that Dillon had fiduciary duties to Acuren and that Dillon breached those duties, and API knowingly participated and encouraged the furtherance of Dillon's breaches by employing, and/or retaining the services of, Dillon and incentivizing him to:  (i) continue his employment with Acuren so that he could sabotage Acuren's relationship with its employees and customers from the inside; and (ii) solicit Acuren employees and customers. As a result, API may be held liable as a joint tortfeasor under Texas law.

122.    API encouraged the breach of numerous fiduciary duties by Dillon and conspired to conceal and further those fiduciary breaches with Dillon to dishonestly accomplish a tortious result. At all relevant times, API knew that Dillon was committing an on-going tort and fiduciary breaches to Acuren. API's participation was a substantial factor and proximate cause in Dillon's fiduciary breaches. Further, Dillon's fiduciary breaches were made for API's financial benefit.

123.    Such actions taken by Dillon and API have proximately caused injury and damages, and will continue to cause damage, to Acuren. Such breaches have also benefited Dillon and API and were willful and malicious. Acuren is entitled to actual damages, special damages, and

punitive damages in an amount within the jurisdictional limits of this Court. Acuren also seeks injunctive relief prohibiting Dillon and API from further breaches.

124.    Additionally, Acuren requests that this Court place a constructive trust on proceeds, funds, and property obtained as a result of these breaches and that all monies and fees collected by Dillon or API as a result of these breaches be forfeited to Acuren.  Acuren also asks that this Court disgorge any profits obtained by Dillon or API as a result of these breaches and provide such profits to Acuren.

### COUNT V – TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS AND PROSPECTIVE BUSINESS RELATIONSHIPS
*Against Defendants Dillon and API*

125.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

126.    Acuren has valid existing contracts and/or business relationships with its current customers. API and Dillon have willfully and intentionally interfered with these contracts and prospective business relationships.

127.    API and Dillon have induced, or attempted to induce, Acuren's existing clients, as well as prospective business relationships, to reduce or eliminate their business relationship with Acuren.

128.    The acts of API and Dillon were malicious and constituted an intentional interference without justification. The acts of API and Dillon are independently tortious in that, among other things, these acts constitute breach of fiduciary duty, civil conspiracy, unfair competition, and business disparagement. API and Dillon did such acts knowing that their interference with Acuren's existing contracts and prospective business relationships was certain, or substantially certain, to occur as a result of their conduct. As discussed herein, API and Dillon

also acted to directly sabotage Acuren's business, including through improper communications with customers, the timed mass departure, and usurping of corporate opportunities, which impacted prospective relationships with customers.

129.    API's and Dillon's interference is not privileged or justified.  As a result of their interference with Acuren's existing contracts and prospective business relationships, Acuren has suffered actual damages and irreparable damages, including, among other things, loss of goodwill, damage to their reputation, and other pecuniary loss.  Based on API's and Dillon's unlawful interference, Acuren is entitled to all actual damages proximately caused by their acts of interference.  Additionally, Acuren is entitled to exemplary damages because API's and Dillon's acts of interference were willful and malicious.

130.    API and Dillon will continue their interference with Acuren's existing contracts and prospective business relationships, which will irreparably injure Acuren, unless this Court enjoins their improper activities.  Acuren, therefore, also is entitled to injunctive relief to prevent this tortious interference in the future.

### COUNT VI – CIVIL CONSPIRACY
*Against Defendants*

131.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

132.    The Individual Defendants and API designed and effectuated a premeditated plan to sabotage Acuren's employee and customer relationships.  The Individual Defendants accepted a position with API and purposefully kept this fact under wraps for approximately one month so they could continue working for Acuren and buy themselves more time to perpetrate their unlawful plan to solicit Acuren's employees and customers. Dillon also used this time to disparage Acuren and encourage Acuren's employees to apply for positions at API, *while he was still being paid by*

36

*Acuren*.

133.    Defendants conspired to intentionally and unlawfully engage in the acts described in paragraph 132.  It is evident that Defendants had a meeting of the minds in or around March of 2024, wherein they came together to achieve this unlawful purpose through unlawful means. Again, the Meeting and Offer Letter follow litigation where Acuren challenged the very same *modus operandi* employed by API here—the recruitment and mobilization of Acuren's employees to steal Acuren's clients. Thus, there is zero doubt that API was not only fully-aware of the plan, but rather orchestrated its effectuation.

134.    API not only allowed itself to knowingly profit from the Individual Defendants' violations of their respective covenants and fiduciary duties, but it also aided, abetted, and encouraged their unlawful competition with the intent of harming Acuren and depriving Acuren of its employees and clients.

135.    Thus, API conspired with the Individual Defendants to commit the unlawful acts described and alleged herein to unlawfully compete against Acuren and solicit Acuren's employees and clients in whom Acuren has invested time and resources. Defendants are therefore liable for conspiracy to intentionally and unlawfully harm Acuren.

136.    Defendants are jointly and severally liable for all damages caused by these intentional and willful acts of conspiracy.

## COUNT VII – UNFAIR COMPETITION
### *Against Defendants*

137.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

138.    Defendants have engaged in business conduct that is contrary to honest practice in industrial and commercial matters. Specifically, API has conspired with and, indeed, encouraged

the Individual Defendants to breach their fiduciary obligations to Acuren and, while employed by Acuren, act in the interest of API in the recruitment of multiple Acuren employees, the solicitation of multiple Acuren clients, and the disparagement of Acuren's business. Defendants' illegal and tortious acts, as described in this Complaint, have interfered with Acuren's ability to conduct its business.

139.    By reason of, and as a direct result of, Defendants' acts of unfair competition, Defendants have benefited and will benefit.  As a direct result of Defendants' unfair competition, Defendants have damaged and will continue to damage Acuren in an amount that is not presently ascertainable.

140.    Defendants will continue their acts of unfair competition, which will cause further irreparable injury to Acuren, unless this Court enjoins Defendants' improper activities.  As such, Acuren is entitled to all damages caused by Defendants' unfair competition, exemplary damages, and injunctive relief to prevent this unfair competition in the future.

### COUNT VIII – BUSINESS DISPARAGEMENT
#### *Against Defendant Dillon*

141.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

142.    As described in this Complaint, prior to and after his departure from Acuren, Dillon published disparaging words to Acuren employees about Acuren's economic interests. In particular, upon information and belief, Dillon made disparaging comments about Acuren's ability to employ and provide work for its employees. Dillon made these comments intending to cast doubt on Acuren's financial health and future and, thereby, to solicit employees for API.

143.    The disparaging words and remarks were false and made with malice. Dillon made the statements knowing they were false (or with reckless disregard for whether they were true),

38

with ill will, and with an intent to interfere with Acuren's economic interests.

144.    The disparaging words and remarks were not subject to any recognized privilege.

145.    Dillon's disparaging words and remarks caused Acuren to suffer special damages, including, without limitation, the loss of employees. Acuren, therefore, seeks compensation for such special damages.

146.    Defendants will continue their business disparagement of Acuren, which will irreparably injure Acuren, unless this Court enjoins their improper activities. Acuren, therefore, is also entitled to injunctive relief to prevent this business disparagement in the future.

### COUNT IX – COMMERCIAL BRIBERY
### AND VIOLATION OF TEXAS PENAL CODE § 32.43
### *Against Defendants Dillon and API*

147.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

148.    Under Texas Civil Practice and Remedies Code section 41.008, the limitation on exemplary damages of "two times" actual damages does not apply if Defendants committed an enumerated felony, including commercial bribery.

149.    Commercial bribery generally occurs when: (1) a fiduciary intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary, without the consent of his beneficiary; or (2) a person offers, confers, or agrees to confer any benefit the acceptance of which is an offense under the previous subsection. TEX. PEN. CODE § 32.43 (b)-(c). "Fiduciary" includes an agent, employee, or manager. *Id.* at § 32.43(a)(2).

150.    Dillon, as a fiduciary of Acuren, knowingly solicited, accepted, and agreed to

accept benefits from API on agreement or understanding that the benefits would influence him to commit torts against Acuren, his beneficiary, in violation of the Texas Penal Code.  API offered, conferred, and agreed  to confer the above benefits in violation of the Texas Penal Code.  These benefits went beyond mere employment, and included actual or potential salaries, vehicle allowances, signing offers, and commissions.

151.    Thus, Defendants' conduct rises to the level of commercial bribery and violates Texas Penal Code section 32.43.  Acuren seeks exemplary damages in excess of this Court's minimum jurisdictional limits and without any statutory limits.

## COUNT X – RESPONDEAT SUPERIOR/AGENCY, RATIFICATION, VICE PRINCIPAL, AND ACTUAL AUTHORITY

152.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

153.    Acuren has been injured as a result of actions committed by Defendants.

154.    Upon information and belief, the Individual Defendants are employees of API, and certain of these actions were committed while they were acting within the scope of their employment with API.  The acts committed by the Individual Defendants were within their general authority, in furtherance of API's business, and were for the accomplishment of the object for which they were hired. API intentionally conferred authority on the Individual Defendants, intentionally allowed them to believe they had authority, or, by a lack of due care, allowed them to believe they had authority.

155.    The Individual Defendants were acting within the scope of their agency on behalf of API when they committed the unlawful acts.  API approved the acts by word, act, or conduct after acquiring full knowledge of the acts. API's approval was given with the intention of giving validity to the Individual Defendants' acts.

## REQUEST FOR INJUNCTIVE RELIEF

156.    Acuren incorporates by reference each of the foregoing paragraphs as if fully set forth in this count.

157.    Under the DTSA, and due to the Individual Defendants' breach of contract, Acuren is entitled to a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction against Defendants preventing: (1) any disclosure of its Business Information (as defined in the Individual Defendants' Agreements); and (2) any actual or threatened misappropriation of its trade secrets by Defendants and each of their agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of the foregoing (collectively, "Covered Persons").

158.    The Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction should include an order prohibiting the Covered Persons from using or disclosing any of Acuren's Business Information, as defined in the Individual Defendants' Agreements, and trade secrets—specifically, as relevant to this Complaint: (1) protected customer information (customer lists, job history, job schedules, pricing, rates, bids, quotes, opportunities, contacts, MSA terms and expiration dates, contracts, preferences, purchasing history, sales volume, frequencies/schedules, and reports); (2) protected employee information[8] (employee lists containing contact information, compilations of job duties and responsibilities tailored to customer needs, and other private or confidential information belonging to Acuren and/or the employee); (3) protected financial and operational information (operational strengths and weaknesses, profit and loss information, revenue information, budgets and forecasts, business plans, growth and marketing strategies, growth for managing KPIs, marketing plans, and pricing strategies); (4)

---

[8] Excluded from the proposed injunctive relief is any Individual Defendant's own wage/compensation information.

protected inspection manuals, methods, testing procedures, reports, and quality and safety programs; and (5) protected contractor and vendor information (preferred vendor sources for products, vendor purchasing histories, compilations of vendor pricing, rates, and services with relationship discounts, vendor lists containing contact information for key decision-makers, vendor preferences, contractor lists containing contact information, preferred contractors for certain geographic regions or customers, contractor pricing, rates, discounts, and mark-ups, and specialized services performed by contractors).

159.    Further, the Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction should include an order requiring the Covered Persons to return to Acuren, and not keep, any and all Business Information (as defined in the Individual Defendants' Agreements) and trade secrets of Acuren's, including, without limitation, any of the information listed above in paragraph 158. Defendants also should be enjoined from destroying, deleting, erasing, modifying, or otherwise failing to preserve intact any documents, records, or files (written or electronically stored) or any other evidence regarding or related to Acuren's claims and allegations in this Complaint, including, without limitation, any evidence stored on any personal or API computer, electronic device, cloud-based storage account, mobile device, or email account(s).

160.    The Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction additionally should include an order requiring Dillon, Villalta, and Perry to comply with the confidentiality obligations, as well as the non-solicitation covenants, contained in their respective Agreements, as well as order enjoining API from authorizing or directing the Individual Defendants to violate these contractual obligations.

161.    Specifically, the Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction should enjoin the Individual Defendants from, directly or indirectly, selling,

attempting to sell, or assisting in the selling of any non-destructive testing or non-destructive examination services to any of the following customers of Acuren, including any subsidiaries, affiliated entities, or successors for whom Acuren may provide services: Dragon Products, Ltd., Duphil, Inc., Arkema, Inc., Titan Industries, Inc., FlexSteel Pipeline Technologies, Inc., W-Industries, Inc., BASF Corporation, INEOS Styrolution America, LLC, Samsung Austin Semiconductor, LLC, Shell Oil Company, PMI Services North American, Inc., Deer Park Refining Limited Partnerships, and Equilon Enterprises dba Shell Oil Products – US (collectively, the "Restricted Customers"). The Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction should likewise enjoin API from authorizing or directing the Individual Defendants to sell, attempt to sell, or assist in the selling of any non-destructive testing or non-destructive examination services to any Restricted Customer, including any subsidiaries, affiliated entities, or successors of the Restricted Customers for whom Acuren may provide services.

162.    Additionally, the Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction should enjoin Defendants from, directly or indirectly, soliciting, encouraging, or attempting to induce any employee of Acuren with whom they dealt or about whom they had access to confidential information to terminate their employment with Acuren. Further, the Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction should enjoin API from authorizing or directing the Individual Defendants to solicit, encourage, or attempt to induce any employee of Acuren with whom the Individual Defendants' dealt or about whom they had access to confidential information to terminate their employment with Acuren.

163.    The Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction should further enjoin Dillon from making or publishing any defamatory statements about Acuren or any of Acuren's officers, directors, employees, products, services, processes,

policies, manuals, practices, or standards of business conduct.

164.    The Temporary Restraining Order and Preliminary Injunction should further require Defendants to make available, within 48 hours, for forensic imaging (i) the USB Devices connected to their Acuren-issued computers, (ii) any personal phones and computers, and (iii) any business computers, phones, servers, external storage devices, USB devices, OneDrives, Sharepoints, Dropboxes, cloud-based accounts, and other devices and computers containing or that have contained material relating or belonging to or obtained from Acuren.

165.    Acuren requests that this Court equitably toll the duration of the non-solicitation covenants in the Individual Defendants' Agreements for a period of time based on the length of time of the Individual Defendants' breaches of their non-solicitation covenants and add such period of time to the duration of the restrictions in the permanent injunction enforcing the restrictive covenants.

166.    Had the Individual Defendants not breached their obligations to Acuren—in particular, but without limitation, their obligation not to act in opposition to Acuren's best interests—or if Dillon had not breached his duties—including, but not limited to, a duty to deal openly and fully disclose information about matters affecting the company's business, not to use his position for personal gain at Acuren's expense, and not to use Acuren's property and information for his own purpose or the purpose of any third person—none of the Covered Persons would have access to the trade secrets and/or confidential information listed in paragraph 158 above.

167.    The Individual Defendants failed to return to Acuren highly-sensitive, proprietary, confidential, and trade secret information stored on their personal external storage devices, and, in all likelihood, API computers.

168.    Thus, unless the Covered Persons are enjoined from the conduct described herein, there is a substantial threat that Acuren will continue to suffer irreparable harm, including loss and misuse of its proprietary, confidential, and trade secret information, loss of goodwill, and financial losses that are presently not calculable.

169.    The irreparable harm that Acuren will suffer if injunctive relief is denied outweighs the potential harm (if any) to Defendants if injunctive relief is granted.

170.    Granting the requested injunctive relief will not disserve the public interest.

171.    Acuren's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief.

172.    Thus, Acuren is entitled to injunctive relief in the form of a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction as set forth herein.

## DAMAGES

173.    Acuren incorporates by reference the preceding paragraphs in the Complaint.

174.    As a result of Defendants' actions, Acuren has been damaged. Thus, Acuren requests all actual damages resulting from, or proximately caused by, Defendants' actions as described in this Complaint.

175.    Further, Defendants' conduct has been intentional, malicious, and willful and, therefore, entitles Acuren to an award of exemplary damages.

## ATTORNEYS' FEES

176.    Acuren incorporates by reference the preceding paragraphs in the Complaint.

177.    As a result of Defendants' actions, Acuren has engaged the undersigned attorneys and agreed to pay their reasonable attorneys' fees, costs, and expenses incurred in prosecuting this suit to protect Acuren's rights. Acuren seeks recovery of these attorneys' fees, costs, and expenses

as allowed by law and/or contract.

## CONDITIONS PRECEDENT

178.    All conditions precedent have been performed or have occurred, entitling Acuren to the relief requested in this Complaint.

## JURY DEMAND

179.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Acuren hereby asserts its right to a trial by jury on all counts so triable.

## PRAYER FOR RELIEF

With respect to this Complaint, and based on the foregoing, Acuren prays for the following relief:

1. Entry of a Temporary Restraining Order and, pending trial on the merits, a Preliminary Injunction enjoining Defendants from unlawfully soliciting Acuren's employees and customers, disclosing or using Acuren's Business Information, and disparaging Acuren (as requested above) and requiring Defendants to provide certain devices for inspection and forensic imaging;

2. Entry of a Permanent Injunction enjoining Defendants from unlawfully soliciting Acuren's employees and customers, disclosing or using Acuren's Business Information, and disparaging Acuren (as requested above);

3. Entry of judgment ordering specific performance by Dillon, Villalta, and Perry of their respective Agreements;

4. Entry of judgment in Acuren's favor and against Defendants and order Defendants to pay damages to Acuren, in an amount to be proved at trial, plus interest, costs, exemplary damages, and attorneys' fees as allowed by law and/or contract; and

46

5.  Entry of a judgment awarding Acuren all other relief, legal or equitable, to which

they may be entitled.


Dated: <u>May 15, 2024</u>                                    Respectfully submitted,

                                                            ACUREN INSPECTION, INC.

                                                            <u>/s/ Yasser A. Madriz</u>
                                                            Yasser A. Madriz
                                                            MCGUIREWOODS LLP
                                                            (*pro hac vice application forthcoming*)
                                                            State Bar No. 24037015
                                                            ymadriz@mcguirewoods.com
                                                            Meghaan C. Madriz
                                                            MCGUIREWOODS LLP
                                                            (*pro hac vice application forthcoming*)
                                                            State Bar No. 24070241
                                                            mmadriz@mcguirewoods.com
                                                            Sarah Holub
                                                            MCGUIREWOODS LLP
                                                            (*pro hac vice application forthcoming*)
                                                            State Bar No. 24106108
                                                            845 Texas Avenue, Suite 2400
                                                            Houston, Texas  77002
                                                            (832) 255-6361 (Telephone)
                                                            (832) 214-9931 (Facsimile)

                                                            -AND-

                                                            <u>/s/ Jill Hartley</u>
                                                            Jill Hartley (ct10570)
                                                            LAW OFFICES OF JILL HARTLEY, LLC
                                                            100 Pearl Street, 14th Floor
                                                            Hartford, CT 06103
                                                            (860) 249-7143 (Telephone)
                                                            (860) 206-6147 (Facsimile)
                                                            Jill@jhartleylaw.com

                                                            **ATTORNEYS FOR PLAINTIFF**
                                                            **ACUREN INSPECTION, INC.**